UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SIGMA-ALDRICH CO., LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:22-cv-00090-JAR |
| QUANTABIO, LLC, et. al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on the Motion to Dismiss of Defendants Quantabio, LLC and QIAGEN GmbH (collectively, the "Moving Defendants"). (Doc. No. 57). The Motion to Dismiss is fully briefed and ready for disposition. For the reasons delineated below, the Court will deny the Motion.

**Background[1]**

This case concerns a dispute between Plaintiff, Sigma-Aldrich Co., LLC ("Sigma"), and Defendants regarding a contract into which Sigma entered with Quanta Biosciences, Inc. (Doc. No. 49 at 2). Sigma alleges that as assignees or successors-in-interest to the contract between it and Quanta Biosciences, Inc., Defendants failed to properly account for and pay royalties on the sale of its licensed products. *Id.* Defendants Qiagen Beverly, LLC ("Beverly"); Quantabio, LLC; and QIAGEN GmbH ("GmbH") are each subsidiaries of parent company QIAGEN N.V. (Doc. No. 49 at 2). Like Defendants, Quanta Biosciences, Inc. was a member of the QIAGEN N.V. family of companies. *Id*. Quanta Biosciences, Inc. merged with Qiagen Beverly, Inc. on

---

[1] Except where otherwise noted, the facts are taken from Plaintiff's petition, (Doc. No. 49), which the Court accepts as true for the Moving Defendants' motion to dismiss. *See Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768-769 (8th Cir. 2012).

1

December 31, 2016, with Beverly as the surviving entity. *Id*. Qiagen Beverly, Inc. then restructured into Beverly in 2017. *Id.* at 3. Quantabio, LLC is a limited liability company formally established on July 22, 2020. *Id.* at 2. Beverly did not join Gmbh and Quantabio, LLC in this motion, and the Moving Defendants assert that Beverly is the successor-in-interest to Quanta Biosciences, Inc. (Doc. No. 59, Exh. 1, at 2). In contrast, Sigma alleges that Quanta Biosciences, Inc. became "Quantabio" in 2016. (Doc. No. 49 at 2-3). It further contends that "Quantabio" is another possible successor or assignee of the Agreement, "either on its own or taking the later form of the Quantabio, LLC entity[.]" *Id*. at 7. Similarly, GmbH controls the "QIAGEN.com" website, which offers QIAGEN-branded Licensed Products. *Id*. at 3.

Sigma owns U.S. Patent Numbers 7,972,828 (the "'828 patent") and 8,404,464 (the "'464" patent), both of which pertain to the use of thermostable DNA polymerase and anionic detergent. (Doc. No. 49 at 5). As a result of its patent portfolio, Sigma is a primary supplier of the raw material detergent known as PNSE, which Defendants use in combination with thermostable DNA polymerase in the PCR kits Defendants make, sell, or export. *Id*. On July 23, 2012, Quanta Biosciences, Inc. entered into an agreement with Sigma to sell certain licensed products within Plaintiff's '828 and '464 patents (the "Agreement"). *Id*. The Agreement provides:

> 1.6 "Licensed Product(s)" means any new or existing product that, if made, used, sold, offered for sale, imported, exported, otherwise disposed of and/or commercialized absent the license granted in this License would infringe one or more Valid Claims of the License Patents, and any methods using a Licensed Patent…
>
> 1.7 "Net Sales" […] In the event any Licensed Product is sold as part of, or in combination with, other products or services that are not Licensed Products (such combination or products or services, a "Combination Product"), the Net Sales Price of the Licensed Product when sold on a stand-alone basis, as determined above. If the Licensed Product is so integrated with other products or components that it could not be sold on a stand-alone basis, the Net Sales Price of such Licensed Products shall be the Net Sales Price for the Combination Product multiplied by the fraction A/(A+B), where "A" shall equal Quanta's U.S. published list price of the Licensed Product and "B" shall equal the sum of Quanta's fully burdened cost of good of all other products included in the Combination Product…

2

> 3.2 <u>Reports, Records and Accounting</u>. From the Effective Date and during the Term, Quanta shall furnish to Sigma within sixty (60) days of December 31 and June 30 of each Calendar Year a written report showing:
>
>> (a) <u>Licensed Products Under the Licensed Patents</u>. (i) the number of Licensed Products sold by Quanta and its Affiliates and Distributors…

*Id*. at 6. The parties amended the contract once in 2013 to expand the field of use for the patent rights to making, using, and selling diagnostic kits. (Doc. No. 49 at 5). Throughout the eight years following the initial execution of the Agreement, Sigma was paid royalties based on the Net Sales of Licensed Products, rather than under the Agreement's calculation for Combination Products. (Doc. No. 49 at 6).

QIAGEN companies, including GmbH, refused Sigma's request to reveal how it employed its PNSE detergent in potentially Licensed Products on or around October 2020. (Doc. No. 49 at 11). As Sigma was otherwise unable to determine which products were properly subject to a royalty obligation, it hired an independent CPA firm to conduct a royalty audit from the period of January 1, 2018 through June 30, 2020. *Id*. During the audit, GmbH informed the auditors that it has and continued to use Sigma's PNSE in products that it unilaterally and arbitrarily designates as "non-Licensed Products." *Id*. In particular, Stephanie Heidelbach, of the Controlling Department of GmbH and a dubbed "Licensee personnel" in the Audit Report, corresponded with the auditors, and later Sigma, regarding the 2020-2021 royalty reports. *Id*. at 10-11. Each of these correspondences were shown as being with "QIAGEN," generally. *Id*. at 12 n.1.

The independent Audit Report concluded that there were three principal breaches of the Agreement: (i) material underpayment of due royalties, (ii) improper format and content of royalty reports, and (iii) failure to report end-user Net Sales by distributors. (Doc. No. 49 at 12). On July 22, 2021, Sigma sent a Notice of Default to QIAGEN, identifying material breaches of the

3

Agreement. (Doc. No. 49 at 17). However, as of the filing of the Complaint and Amended Complaint, none of these breaches have been cured. *Id*.

On January 24, 2022, Sigma initiated this civil action by filing a sealed Complaint. (Doc. No. 2, Exh. 2). Sigma amended this complaint on June 8, 2022. (Doc. No. 49). The Amended Complaint includes seven counts against all Defendants: (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing, (iii) breach of implied-in-fact contract, (iv) specific performance, (v) promissory estoppel, (vi) unjust enrichment, and (vii) quantum meruit. *Id*. The Moving Defendants filed a motion to dismiss the Amended Complaint on June 28, 2022, alleging that they are not parties to the Agreement, and thus, cannot be liable for its breach. (Doc. 59, Exh. 1).

## Legal Standards

Federal Rule of Civil Procedure 12(b)(6) provides for a motion to dismiss based on the "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, a complaint must show "'that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). The pleading standard of Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned,

4

the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). All reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012).

## Discussion

### A. Parties to the Agreement

The Moving Defendants first assert that Sigma's Count I (breach of contract), II (breach of the implied covenant of good faith and fair dealing), and IV (specific performance) must each be dismissed because they are not parties to the Agreement.  (Doc. No. 59, Exh. 1 at 5). Under Missouri law, a breach of contract claim requires the following elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010) (citing *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 650 (Mo. App. 1997)).  Likewise, "an enforceable contract must exist before the duty of good faith and fair dealing can be implied by law into it." *Tcp Printing Co., LLC v. Enter. Bank & Trust*, No. 4:15-CV-178 JAR, 2017 WL 4357378, at *6 (E.D. Mo. Sept. 29, 2017) (quoting *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012)).  The Moving Defendants claim that because they are not expressly listed as parties in the Agreement, they cannot be held liable for its breach or any breach of the duty of good faith and fair dealing. (Doc. No. 59, Exh. 1 at 5).  Similarly, the Moving Defendants argue that they cannot be asked to comply with a contract through specific performance when they are not parties to that contract.  *Id*.  Sigma asserts two arguments in response to the Moving Defendants' claims:

5

(i) GmbH and Quantabio, LLC received equitable assignments of the Licensee rights contained in the Agreement, and (ii) the Court may pierce the corporate veil to find that GmbH dominates other QIAGEN entities in respect to the transactions under the Agreement. (Doc. No. 73, Exh. 1 at 6, 9, 11). As discussed herein, the Court finds that Sigma states a claim based upon these arguments.

   1. *Equitable Assignment*

An assignment is accomplished when there appears from the circumstances there is an intention on one side to assign at present time and on the other side to receive. *Miller v. Dannie Gilder, Inc.,* 966 S.W.2d 397, 398 (Mo. Ct. App. 1998) (citing *Barker v. Danner,* 903 S.W.2d 950, 956 (Mo. Ct. App. 1995)). Similarly, an equitable assignment is one which gives the assignee a title not cognizable at law, though recognized and protected in equity. 6 Am. Jur. 2d Assignments § 5 (Feb. 2023 update). No particular form is necessary to constitute an equitable assignment, so long as there is: (1) an intention to assign; (2) an assent to receive; and (3) consideration. *Estate of Harvey v. Luther College,* 802 S.W.2d 585, 587 (Mo. Ct. App. 1991). Creation of an equitable assignment further requires conferring a complete and present right on the party meant to be accounted for. *State ex rel. United Industries Corp. v. Mummert*, 878 S.W.2d 494, 497 (Mo. Ct. App. 1994). The assignor "must unequivocally part with the power of control over the thing assigned, and if he retains control it is fatal to the claim of the assignee. There must be some character of delivery, actual or symbolic, or some act to place the fund beyond the control of the assignor." *Id*. (internal citations omitted).

Though the creation of an equitable assignment requires transfer of control to the assignee, Courts recognize the possibility of a partial equitable assignment, in which the assignor cedes control of only some of the rights and obligations at issue. *See Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 773-774, n.4 (2000) (noting that the False Claims

Act may be interpreted as "effecting a partial assignment of the Government's damages claim" in equity). Once an interest under a contract is assigned, it "necessarily follows" that if the plaintiff could sue the original party for breach of contract, that plaintiff may sue a partial assignee if it violates the terms of the part of the contract assigned. *See Olsen v. Nelnet, Inc.*, 392 F.Supp.3d 1006, 1017 (D. Neb. 2019) (citing *In re Ocwen Loan Servicing, LLC*, 491 F.3d 638, 645 (7th Cir. 2007)). Thus, a plaintiff may sue a non-signatory to a contract for breach of contract if that non-signatory was partially assigned obligations under that contract. *See Mazzei v. Money Store*, 308 F.R.D. 92, 109 (S.D.N.Y. 2015).

    a. <u>Extrinsic Evidence</u>

The Moving Defendants assert that the Agreement explicitly and unambiguously grants a license only to Quanta Biosciences, Inc., states that Quanta Biosciences, Inc. is responsible for all royalty payments, and discloses that any authorization given to affiliates of Quanta Biosciences, Inc. is merely an authorization, rather than a sub-license. (Doc. No. 59, Exh. 1 at 9). Thus, the Moving Defendants are merely authorized to sell Sigma's products, rather than granted rights through equitable assignment. In response, Sigma urges the Court to consider the Agreement's use of the term "authorized Affiliate," "authorized," "authorize," and "authorization" ambiguous. (Doc. No. 73, Exh. 1 at 10). If these terms are ambiguous, Sigma argues that the Court may turn to extrinsic evidence of Quanta Biosciences, Inc.'s intent to assign rights to GmbH and Quantabio, LLC. (Doc. No. 49 at 9-10).

"The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973). When a contract contains an integration clause, as the Agreement does, parol evidence may only be considered if there is an ambiguity which cannot be

7

resolved within the four corners of the contract. *See Tribus, LLC v. Greater Metro, Inc.*, 589 S.W.3d 679, 702 (Mo. Ct. App. 2019). If the Agreement is ambiguous, then the Court may consider parol evidence regarding Quanta Bioscience, Inc's intent to assign, along with GmbH's and Quantabio, LLC's intent to receive, supporting denial of the motion to dismiss at this stage.

The presence of ambiguity is a question of law. *See Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012). "A contract is ambiguous only if its terms are susceptible to more than one meaning so that reasonable [persons] may fairly and honestly differ in their construction of the terms." *Eisenberg v. Redd*, 38 S.W.3d 409, 411 (Mo. banc 2001) (quoting *Jake C. Byers, Inc. v. J.B.C. Invs.*, 834 S.W.2d 806, 816 (Mo. App. 1992)). "An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract." *Patterson v. Rough Road Rescue, Inc.*, 529 S.W.3d 887, 894 (Mo. Ct. App. 2017) (citing *J.H. Berra Constr. Co., Inc. v. City of Washington*, 510 S.W.3d 871, 874-75 (Mo. Ct. App. 2017)). A contract is "not ambiguous simply because the parties disagree over its meaning." *Yerington v. La-Z-Boy, Inc.*, 124 S.W.3d 517, 520 (Mo. App. 2004) (citing *Cosky v. Vandalia Bus Lines, Inc.*, 970 S.W.2d 861, 865 (Mo. Ct. App. 1998)).

The Agreement provides, in relevant part:

1.1     "Affiliate" means any corporation, company, or other entity which controls, is controlled by, or is under common control with a person or entity. "Control" shall mean (a) in the case of corporate entities, direct or indirect ownership of at least fifty percent (50%) of the stock or shares having the right to vote for the election of directors, and (b) in the case of non-corporate entities, direct or indirect ownership of at least fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entities.

2.1     Grant to Quanta. […] Quanta will have the right to authorize any of its Affiliates to practice any or all of the rights received by Quanta under this License and upon such authorization such authorized Affiliates shall have the right to practice any such authorized right. Any such authorization by Quanta to any of its Affiliates shall not be construed as a sub-licensee…

       2.2.      <u>Assignment</u>.  Quanta may not assign the rights or obligations under the License to any person or entity without the prior written consent of Sigma, except that Quanta may assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of Sigma, but with prior notice to Sigma, to (i) an Affiliate of Quanta, or (ii) to any person or entity that acquires all or substantially all of the business associated with this License…

(Doc. No. 49, Exh. 3 at 1, 4). Sigma argues that the tension between the Agreement's permission to Quanta Biosciences, Inc. to authorize its Affiliates to practice "any or all of the rights" it received and the requirement that any "such authorization…shall not be construed as a sub-licensee." (Doc. No. 49 at 9).  This contradiction in the terms of the Agreement demonstrates a patent ambiguity, allowing the Court to resolve this ambiguity by turning to extrinsic evidence. *Cf. Keck v. American Family Mut. Ins. Co.*, 299 S.W. 3d 63, 66 (Mo. Ct. App. 2009) (finding that contradictory clauses in an insurance agreement established an ambiguity to be construed against the insured).  To determine whether there is an equitable assignment to the Moving Defendants under the Agreement, the Court examines parol evidence, including the parties' behavior and statements regarding the Agreement.

       b.    <u>Equitable Assignment to GmbH</u>

Sigma alleges that circumstantial evidence indicates at least a partial assignment of Licensee rights to GmbH.  (Doc. No. 73, Exh. 1 at 5-6).  At some time prior to 2019, without Sigma's knowledge, GmbH was assigned at least responsibility for royalty-bearing activities with respect to Licensed Products under the Agreement.  (Doc. No. 49 at 7).  Similarly, Beverly and "Quantabio" or Quantabio, LLC retained responsibility for accounting for their own royalty-bearing end-use of Licensed Products. *Id*.  Each purported "licensee" separately self-identified as a licensee to Sigma and individually accounted for its own Licensed Products sold, Net Sales, and total royalty payable on Net Sales. *Id*.

9

Due to COVID-19, internal demand by Sigma and other PNSE customers, Sigma's PNSE raw material inventory was exhausted. (Doc. No. 49 at 7). During this time of increased demand and decreased supply, in early 2020, Sigma signed a Material Transfer Agreement ("MTA") to supply additional PNSE material to GmbH. *Id*. at 7-8. The MTA confirmed the existence of more than 160 PNSE kits in GmbH's PCR portfolio. *Id*. at 8. As "Licensee," GmbH acted as signatory for the additional PNSE detergent included in the MTA. *Id*. Under the MTA, Sigma manufactured PNSE detergent specifically for GmbH; this manufacturing enabled Beverly to place orders for Sigma's PNSE material. *Id*. GmbH also began paying a running royalty to Sigma during this time. *Id*.

Because of GmbH's self-reference as "Licensee," payment of royalties, and furnishing of royalty reports, Sigma understood that GmbH had undertaken the role of an assignee with respect to certain activities licensed under the Agreement. (Doc. No. 49 at 9). Sigma alleges the Agreement signatory and successor-in-interest, whether Beverly; Quantabio, LLC; or "Quanta," demonstrated an intent to at least partially equitably assign these rights under the Agreement by giving GmbH such responsibilities. *Id*. at 9-10. These allegations are sufficient to demonstrate an equitable assignment of rights and obligations under the Agreement. The Court therefore finds that Sigma has alleged that GmbH was assigned rights and obligations under the Agreement, and that therefore, Sigma states a viable claim against GmbH, as an equitable assignee, for breach of contract, breach of the implied covenant of good faith and fair dealing, and for specific performance.

      c. <u>Equitable Assignment to Quantabio, LLC</u>

Sigma asserts that, though Quantabio, LLC is not a party to the Agreement as a signatory, it is nevertheless an appropriate party to this action because it is either an assignee of rights and

obligations under the Agreement or the successor-in-interest to Quanta Biosciences, Inc. (Doc. No. 73, Exh. 1 at 11). In its complaint, Sigma alleges that Quanta Biosciences, Inc. bore the sole responsibility for furnishing bi-annual royalty reports to Sigma under the Agreement, including biannual reports for 2019, 2020, and 2021. (Doc. 49 at 6). Nevertheless, GmbH furnished five of the six royalty reports, in which it listed itself as "Licensee." *Id*. No other Affiliate entity furnished these reports during this time. *Id*. An entity called "Quatna Biosciences" did furnish additional reports, even though, at this time, Quanta Biosciences, Inc. no longer existed. *Id*. at 7. At least some of the Licensed Products listed on the "Quanta Biosciences" reports are sold at "quantabio.com;" Sigma alleges that Quantabio, LLC controls this website. *Id*.

The Moving Defendants point out that Quantabio, LLC did not exist as a corporate entity until 2020. (Doc. No. 85, Exh. 1 at 12). In contrast, QIAGEN Beverly, Inc. merged with signor Quanta Biosciences, Inc., and then transitioned into Beverly four years prior to Quantabio, LLC's formation. *Id*. In any event, Sigma's complaint alleges that Quantabio, LLC sells Licensed Products through the quantabio.com website, indicating additional rights Quantabio, LLC enjoys as a potential assignee of rights under the Agreement. Taking all facts alleged in the complaint as true, the Court finds a factual determination regarding the status of Quantabio, LLC and whether it was equitably assigned any rights from the Agreement is premature and not proper at this stage of the proceedings. *Cf. Gewecke v. US Bank N.A.,* Civil No. 09-CV-1890 (JRT/LIB), 2011 WL 4538083, at *6 (D. Minn. Jun. 6, 2011) (declining to resolve a factual dispute related to equitable assignments on a motion to dismiss). The Court therefore denies the Motion to Dismiss regarding Quantabio, LLC.

## 2. Piercing the Corporate Veil

"Under Missouri law, there is a presumption of corporate separateness, and courts do not lightly disregard the corporate form to hold a parent company liable for the torts of a subsidiary." *Iridex Corp. v. Synergetics USA, Inc.,* 474 F. Supp. 2d 1105, 1109 (E.D. Mo. 2007) (citation omitted). Therefore, "[a] wholly owned subsidiary is generally treated as a separate entity." *Id.* (citation omitted); *see also Mid-Missouri Tel. Co. v. Alma Tel. Co.,* 18 S.W.3d 578, 582 (Mo. Ct. App. 2000). "Of course, where circumstances exist that would allow the wronged party to pierce the corporate veil, a parent corporation could then incur liability, thus losing the parent/subsidiary distinction." *Mid-Missouri Telephone Co.,* 18 S.W.3d at 582 (citation omitted). Missouri courts will "pierce the corporate veil" when a plaintiff can establish (1) control, including "complete domination ... in respect to the transaction attacked," (2) that such control was used to commit fraud or wrong, perpetuate violation of a statutory or other legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights, (3) and that the control and breach proximately caused the applicable injury or unjust loss. *Greater St. Louis Const. Laborers Welfare Fund v. Mertens Plumbing and Mech., Inc.,* 552 F. Supp. 2d 952, 955 (E.D. Mo. Dec.13, 2007) (citations omitted); *see also Radaszewski v. Telecom Corp.*, 981 F.2d 305, 306 (8th Cir. 1992).

Sigma alleges that GmbH dominates the other Defendants with respect to the transactions at issue, such that Beverly and Quantabio, LLC are its alter egos. (Doc. No. 49 at 17). Allegations of this alter ego relationship include: (i) QIAGEN entities were each deeply involved in an independent royalty audit process; (ii) a royalty check dated October 1, 2019 was on check stock of "Qiagen Beverly, Inc.," which did not exist at that time; (iii) separate royalty reports were received from Quanta Biosciences, which did not then exist, and GmbH; (iv) Beverly, GmbH, Quanta Biosciences, Inc., "Quanta," and Quantabio, LLC each were viewed as candidates for

12

licensee status under the Agreement; (v) correspondence related to royalty reports involved individuals affiliated with both GmbH and other QIAGEN entities; (vi) the correspondence used the name QIAGEN to identify those involved; (vii) substantial overlap of corporate officers existed; and (viii) additional overlap between Beverly and Quantabio, LLC with respect to principal offices and addresses listed for corporate officers existed. *Id*. at 18.

Based on these claims, the Court finds that Sigma plausibly alleges alter ego liability against GmbH. Determining whether GmbH may be held liable under an alter ego theory requires a fact-intensive inquiry that cannot be resolved at the motion to dismiss stage. *See Cass Com. Bank v. Cap. Tech. & Leasing, LLC*, No. 4:14-CV-307 RWS, 2015 WL 4775102, at *3 (E.D. Mo. Aug. 13, 2015) (citation omitted) (finding alter-ego inquiry is fact-intensive and "should normally not be disposed of by summary judgment"). While Defendants cite multiple cases where courts in this district have dismissed alter ego claims at the pleadings stage, those cases are distinguishable because the respective plaintiffs failed to make the necessary allegations to support an alter ego claim. *See, e.g.*, *Nestle Purina Co. v. Blue Buffalo Co. Ltd.*, No. 4:14-CV-859-RWS, 2016 WL 5390945, at *6 (plaintiff's alter ego claim "fails because it never alleges that the individual defendants themselves controlled anything other than Diversified's finances."). Because Sigma alleges the necessary elements of an alter ego claim, the Court will not dismiss GmbH from the action.

## B. The Existence of an Implied-in-Fact Contract

As to Count III, the Moving Defendants claim that GmbH cannot be held liable for breach of an implied-in-fact contract because Sigma fails to allege facts establishing a meeting of the minds on essential terms of the contract allegedly implied. (Doc. No. 59, Exh. 1 at 13). Under Missouri law, an implied-in-fact contract may arise when parties "manifest their promises by language or

13

conduct which is not explicit." *Westerhold v. Mullenix Corp.*, 777 S.W.2d 257, 263 (Mo. Ct. App. 1989). An implied in fact contract requires a "meeting of the minds on essential terms." *Nickel v. Stephens Coll.*, 480 S.W.3d 390, 397 n.6 (Mo. Ct. App. 2015).  In contrast, a quasi-contract, or contract implied in law, which does not require an intent to be bound by the contract. *See Am. Eagle Waste Indus., LLC v. St. Louis Cty.*, 379 S.W.3d 813, 828 (Mo. banc 2012).

The Moving Defendants claim that Sigma fails to specify the terms of an implied-in-fact contract to which GmbH agreed, as Sigma refers to the implied-in-fact contract as both separate from and along similar lines as the Agreement itself.  (Doc. No. 59, Exh. 1 at 13).  However, Missouri courts have consistently found implied-in-fact contracts with similar terms and conditions as existing contracts.  *See, e.g., Schonwald v. F. Burkart Mfg. Co.*, 202 S.W.2d 7, 16-17 (Mo. 1947) (distinguishing between a breach of express contract, and a breach of a substantially similar implied-in-fact contract in jury instructions).  Sigma alleges that GmbH accepted royalty-bearing obligations, including furnishing reports and accounts of its sales, while Plaintiff provided GmbH with the products necessary to make, use, and sell Licensed Products in return.  (Doc. No. 49 at 10).  As demonstrated by the parties' conduct, Sigma alleges mutual promises and terms of the implied-in-fact contract sufficient to state a claim. Thus, the Court denies the motion to dismiss Count III of Sigma's complaint.

### C. Specific Performance

The Moving Defendants next argue that Count IV of Plaintiff's Amended Complaint, for specific performance of the Agreement, must be dismissed as to both Moving Defendants.  (Doc. No. 59, Exh. 1 at 12).  "Equitable remedies are only available where the remedy at law, money damages, would not adequately compensate the plaintiff." *Aziz v. Allstate Ins. Co.*, No. 4:14-CV-934-CEJ, 2015 WL 13688049, at *2 (E.D. Mo. Feb. 27, 2017).  The Moving Defendants assert

that Sigma would be fully compensated by money damages in this instance.  (Doc. No. 59, Exh. 1 at 12).

Sigma argues that its claim for specific performance is alleged in the alternative to its implied-in-fact and breach of contract claims.  (Doc. No. 73, Exh. 1 at 16).  According to the Federal Rules of Civil Procedure, "[a] party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed.R.Civ.P. 8(d)(2). "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *Id.* "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed.R.Civ.P. 8(d)(3).

The liberal policy reflected in Rule 8(d)(2) mandates that courts not construe a pleading "as an admission against another alternative or inconsistent pleading in the same case." *McCalden v. Cal. Library Ass'n.*, 955 F.2d 1214, 1219 (9th Cir. 1990). Thus, although a plaintiff may not recover on both theories, "a plaintiff may claim ... remedies as alternatives, leaving the ultimate election for the court." *SIM Surgical, LLC v. Spinefrontier, LLC,* No. 20-cv-1060-JAR, 2020 WL 6822573, at *3 (E.D. Mo. Nov. 20, 2020) (quoting *E .H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20, 23 n. 3 (9th Cir. 1975)).

The Court holds that Sigma may therefore plead a claim for breach of contract, breach of an implied-in-fact contract, and for specific performance as alternative counts. Furthermore, as Sigma points out, the Agreement calls for more than payment of royalties, including the accounting for Net Sales of Licensed Products. The Court finds that specific performance is a permissible remedy for such claims.  (Doc. No. 73, Exh. 1 at 16).  Accordingly, the Court denies the Moving Defendants' Motion to Dismiss as to Count IV.

### D. Promissory Estoppel

The Moving Defendants assert the Court should dismiss Count V of Plaintiff's complaint, for promissory estoppel, because Plaintiff fails to allege that GmbH made any sufficiently delineated promise, justifying dismissal of this claim. (Doc. No. 59, Exh. 1 at 15-16). Promissory estoppel has four elements under Missouri law: "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way that the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (citing *Zipper v. Health Midwest*, 978 S.W.2d 398, 411 (Mo. Ct. App. 1998)). "Courts are to apply the doctrine of promissory estoppel 'with caution, sparingly and only in extreme cases to avoid unjust results.'" *Kearney Commercial Bank v. Popejoy*, 119 S.W.3d 143, 146-47 (Mo. Ct. App. 2003) (quoting *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 165 (Mo. Ct. App. 2000)). A claim of promissory estoppel requires that the plaintiff "allege a promise made by the defendant." *Jamison Elec. L.L.C. v. Dave Orf, Inc.*, 404 S.W.3d 896, 898 (Mo. Ct. App. 2013). The "elements of promissory estoppel are fact dependent," and they "necessarily involve fact-finding and require inquiry into the circumstances surrounding the making of the promise." *Ruzicka v. Conde Nast Publ'ns, Inc.*, 999 F.2d 1319, 1322 (8th Cir. 1993) (applying Minnesota law); *see also Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 81 (Mo. Ct. App. 2003) ("It has been broadly held that estoppel ... is a question of fact.") (internal quotation omitted).

Sigma specifically alleges that GmbH characterized itself as a "Licensee" in royalty reports, thus promising to undertake the duties and responsibilities of a Licensee. (Doc. No. 49 at 6). Sigma also states that GmbH promised Sigma to accurately, truthfully, and completely account for

16

the actual Net Sale of Licensed Products, and to pay a running royalty thereupon to compensate Sigma for its use. *Id*. at 21. When providing GmbH the rights to manufacture, develop, and commercialize Licensed Products, Sigma detrimentally relied on this promise. *Id*. at 22. These allegations are sufficiently detailed to allege a broken promise by GmbH. The Court, therefore, denies the motion to dismiss Count III of Sigma's complaint.

### E. Unjust Enrichment and Quantum Meruit

Count VI alleges a claim for unjust enrichment and Count VII alleges a claim for *quantum meruit*. (Doc. No. 49 at 22-23). The Moving Defendants argue that the Court must dismiss both counts for Sigma's failure to allege a benefit the Moving Defendants unjustly received. (Doc. No. 59, Exh. 1 at 17).

Quantum meruit and unjust enrichment are claims in quasi-contract intended to compensate the plaintiff for the defendant's unfair retention of value. "While the lines are often blurred with regard to quantum meruit and unjust enrichment, [the Court] recognize[s] these as separate causes of action." *Holliday Investments, Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. Ct. App. 2015) (collecting cases). Still, both require the same general proof:

> 1) that the plaintiff provided to the defendant materials or services at the defendant's request or with the acquiescence of the defendant; 2) that the materials or services had reasonable value; and 3) that—despite the demands of the plaintiff—the defendant has failed and refused to pay the reasonable value of such materials or services.

*Downing v. Goldman Phipps PLLC*, No. 4:13 CV 206 CDP, 2017 WL 1050980, at *3 (E.D. Mo. Mar. 20, 2017) (citing *County Asphalt Paving Co. v. Mosley Constr., Inc.*, 239 S.W.3d 704, 710 (Mo. Ct. App. 2007)); *see also Flowshare, LLC v. TNS, US, LLC*, No. 4:16-cv-00300-JAR, 2017 WL 3174321, at *6 (E.D. Mo. July 26, 2017) (listing the elements of unjust enrichment as the defendant's acceptance of a benefit at the plaintiff's expense which would be unjust to keep). The primary difference between these claims is the method and amount of recovery.

17

In quantum meruit, the plaintiff is entitled to the reasonable value of the improperly retained materials or services. In unjust enrichment, the plaintiff is entitled to repayment only of the amount that would be unjust for the defendants to retain. *Johnson Grp., Inc. v. Grasso Bros.*, 939 S.W.2d 28, 30 (Mo. Ct. App. 1997).

The Moving Defendants point out that the only benefits Sigma alleges they unjustly received are the rights to develop, manufacture, and commercialize Licensed Products as outlined in the Agreement. (Doc. No. 59, Exh. 1 at 17). Thus, if Sigma is successful on its claim for breach of contract, it cannot also be successful on its unjust enrichment and *quantum meruit* claims. *Id.* Sigma concedes this but asserts that is able to plead unjust enrichment and *quantum meruit* claims as alternative counts. The law supports Sigma's assertion. *See supra* at 15. As Sigma is able to plead mutually exclusive counts as alternative theories of liability, the Court will not dismiss Counts VI or VII of Plaintiff's complaint. At these early stages of the proceedings, the Court finds that Sigma has sufficiently stated its claims against the Moving Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that the Moving Defendants' motion to dismiss, (Doc. No. 57) is **DENIED**.

Dated this 27th day of March, 2023.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE